**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3586-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MUMEEN A. STARKS,

    Defendant-Appellant.

_____

Submitted February 1, 2017 — Decided July 24, 2017

Before Judges Carroll and Gooden Brown.

On appeal from the Superior Court of New
Jersey, Law Division, Essex County, Indictment
No. 08-07-2240.

Joseph E. Krakora, Public Defender, attorney
for appellant (William P. Welaj, Designated
Counsel, on the brief).

Carolyn A. Murray, Acting Essex County
Prosecutor, attorney for respondent (Camila A.
Garces, Special Deputy Attorney
General/Acting Assistant Prosecutor, of
counsel and on the brief).

PER CURIAM

Defendant appeals from a December 2, 2014 order, denying his first petition for post-conviction relief (PCR). Having reviewed the record in light of the applicable legal principles, we affirm.

I.

Following a jury trial, defendant was convicted of murder, N.J.S.A. 2C:11-3(a)(1)(2); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b); and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a). Defendant was sentenced on December 7, 2009, to an aggregate term of life in prison, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[1]

The convictions stemmed from defendant firing several gunshots at approximately 10:30 p.m. on April 18, 2008, into a vehicle occupied by Tynesha Morris and her cousin, Theo Stewart, following a verbal altercation with Morris. Stewart was struck by two of the bullets and died as a result of his gunshot wounds. At trial, the State presented eyewitness testimony from Morris, her cousin, Frank Parker, and their mutual friend, Demetrius

---

[1] Following the trial, defendant pled guilty to third-degree unlawful taking of a means of conveyance, N.J.S.A. 2C:20-10, and second-degree eluding, N.J.S.A. 2C:29-2(b), and was simultaneously sentenced. Those offenses occurred five days after the homicide, were charged in a separate indictment, and are not part of this appeal.

Heyward. Parker and Heyward testified to recognizing defendant from the neighborhood. Heyward saw defendant pull out a gun and fire three to four shots within two feet of him. Parker heard the gunshots and saw defendant running from the scene. Morris observed defendant holding a gun immediately after the shots were fired. Defendant was described as wearing a black hoodie with a distinctive multi-colored design.

Defendant filed a direct appeal, asserting the following arguments:

> POINT I: THE TRIAL JUDGE ERRED IN DENYING THE DEFENDANT'S REPEATED REQUESTS FOR A MISTRIAL, A REQUEST BASED ON THE INCLUSION OF NUMEROUS INSTANCES OF PREJUDICIAL TESTIMONY.
>
> POINT II: THE TRIAL JUDGE ERRED IN DENYING THE DEFENDANT'S REQUEST TO HAVE THE JURY CHARGED ON PASSION/PROVOCATION MANSLAUGHTER AS A LESSER OFFENSE OF MURDER.
>
> POINT III: THE DEFENDANT'S SENTENCE IS EXCESSIVE.

We affirmed defendant's convictions and sentence, State v. Starks, No. A-2802-09 (App. Div. Oct. 24, 2011), and our Supreme Court denied defendant's petition for certification. State v. Starks, 210 N.J. 109 (2012).

On June 26, 2012, defendant filed a timely pro se petition for PCR and was later assigned counsel who filed a supporting brief. In the brief, defendant argued that his trial counsel was

ineffective for: (1) failing to present an alibi defense; (2) failing to advise defendant about his right to testify at trial; (3) failing to inform the judge that a juror had been sleeping; and (4) failing to object to an erroneous stipulation. Defendant also argued that he was denied a fair trial because of the trial court's mishandling of a jury question and the cumulative effect of the errors. In addition, defendant argued that he was denied the effective assistance of appellate counsel.

Following oral argument, Judge Verna G. Leath rejected defendant's claim that his "appellate counsel's performance was deficient or that there was a reasonable probability that but for counsel's deficient performance (which was not established), defendant's conviction[s] would have been overturned." Based on trial counsel's performance at trial as well as the fact that defendant's convictions and sentence were affirmed on appeal, Judge Leath also rejected defendant's assertion that "the cumulative effect of trial counsel's errors rendered his trial unfair."

Judge Leath did, however, grant defendant's request for an evidentiary hearing limited to defendant's claims regarding trial counsel's failure to call alibi witnesses, to advise defendant of his right to testify, and to object to an erroneous stipulation entered without defendant's consent. Regarding the sleeping juror

4

claim, Judge Leath considered defendant's averment in his supporting certification that trial counsel took no action when he informed him that he observed one of the jurors who later became the foreperson nodding off during the course of the trial. However, Judge Leath precluded its exploration at the evidentiary hearing, finding that such testimony would not elucidate the issue since there was nothing in the record "to indicate if or when a juror was sleeping" and nothing to indicate whether a juror's eyes were closed to enhance the "ability to focus" which "is not uncommon in . . . trials[.]"

The evidentiary hearing commenced on September 12, 2013, at which time Judge Leath conducted a preliminary voir dire of trial counsel focused solely on defendant's waiver of the attorney-client privilege in order to pursue his ineffective assistance of counsel claim. Prior to the hearing, the prosecuting attorney disclosed to Judge Leath and PCR counsel that, three days prior, he had spoken to trial counsel briefly to prepare him to testify for the State at the upcoming evidentiary hearing and specifically discussed with trial counsel the alibi witnesses he spoke with and his investigator's attempts to locate them. At PCR counsel's request, Judge Leath sought to ascertain whether trial counsel violated the attorney-client privilege during that five-minute conversation with the prosecuting attorney by discussing the case

outside the presence of defendant and PCR counsel.[2] Judge Leath also permitted PCR counsel to cross-examine trial counsel on that specific issue.

During the voir dire, there were inconsistencies between trial counsel's recollection of the conversation and the prosecuting attorney's account, prompting defendant to move to disqualify the prosecuting attorney in order to call him as a witness to undermine trial counsel's credibility. Defendant's application to disqualify the prosecuting attorney was denied by Judge Leath who found that defendant "failed to show a compelling and legitimate need" for disqualification because the prosecuting attorney was "willing to stipulate as to what the conversation . . . was about."

Over defendant's objection, the case was then transferred to Judge Robert H. Gardner to continue the evidentiary hearing. PCR counsel opposed the transfer, arguing that because credibility was

---

[2] See ABA Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456 (July 14, 2010) (addressing disclosure of information to a prosecutor by a criminal defense lawyer whose former client claims ineffective assistance of counsel and providing that "[o]utside judicial proceedings, . . . the lawyer may not voluntarily disclose any information, even non-privileged information, relating to the defendant's representation without the defendant's informed consent.") available at https://www.americanbar.org/content/dam/aba/images/crsj/DPDPRP/ethics_opinion_10_456.authcheckdam.pdf.

a key factor, Judge Leath was in a better position to assess PCR counsel's credibility from the inconsistencies elicited during the preliminary voir dire. Judge Gardner overruled PCR counsel's objection to the transfer. Judge Gardner explained that the case was assigned to Judge Leath while he was assigned to the Family Part. However, once he returned to the Criminal Division, the Criminal Presiding Judge transferred the case to him presumably because he had presided over the trial. Noting that there was no prejudice to defendant because there was no testimony elicited on the substantive PCR claims, Judge Gardner proceeded to conduct the evidentiary hearing over the course of three days.

Six witnesses testified at the evidentiary hearing. Trial counsel and his investigator testified for the State, and defendant, his mother, his sister and his grandfather testified for the defense. Defendant's mother, sister and grandfather, all of whom resided with defendant, testified consistent with their respective certifications that defendant was at home on the night of the homicide. Defendant's mother testified that defendant returned home at approximately 7:00 p.m. and stayed home for the rest of the night. She specifically recalled checking on him at approximately 11:00 p.m. and 2:00 a.m. and he was asleep with his one-year-old daughter. Although she never provided the information to the authorities when defendant was arrested and

charged, she provided the information to an investigator and expected to be called as a witness at defendant's trial. However, despite attending most of the trial proceedings, she was never called to the stand.

Defendant's grandfather could not specify what time defendant returned home. However, he testified that defendant was home before dinner, which was usually about 7:00 p.m., and stayed home with his daughter the rest of the night. Although he never provided the information to the authorities and was never interviewed, he too expected to testify at defendant's trial but was never called. Defendant's sister testified that she saw defendant at home at 3:40 p.m. when she returned home from school. She testified that defendant asked her to babysit his daughter, but she refused. Although she could not specify exactly where defendant was in the house between the hours of 10:00 p.m. and 11:00 p.m., she testified that defendant was home all day and night and she wanted to testify to that effect but was never interviewed or called as a witness. Nonetheless, she also acknowledged that she never provided the information to the authorities once she became aware of defendant's arrest.

Defendant testified that he told his trial attorney, William Strauss, that he was at home at the time in question and that all the members of his household could vouch for him being there.

Defendant acknowledged that the notice of alibi and the defense witness list included the names he provided. Defendant testified he did not know that Strauss was not going to call the alibi witnesses until Strauss began his summation. When he confronted Strauss about it, Strauss responded that "he had the case won, he didn't need to call them." In his supporting certification, defendant averred that when he confronted Strauss about not calling the alibi witnesses, Strauss stated that "because they were my family, the jury would not believe them."

Defendant also testified that he wanted to testify at his trial. However, rather than prepare him to testify or explain the ramifications of testifying, Strauss simply "told [him] not to" and defendant accepted it because he did not know that he could go against his attorney's advice. Defendant conceded, however, that during the trial, he answered in the affirmative when Judge Gardner asked him whether his attorney had explained all the ramifications of testifying or remaining silent and whether the decision to remain silent was his choice.

Defendant testified further that he did not become aware of the trial stipulation agreed to by Strauss regarding the hoodie until 2012 when he was reading his trial transcripts. According to defendant, he would not have agreed to such a stipulation. On cross-examination, when defendant was asked whether he recalled

Strauss stating on the record during the trial that he was stipulating to the hoodie to avoid the State calling the arresting officer to testify that defendant was wearing the hoodie when he was arrested on other charges, defendant denied hearing that colloquy despite being present.

Strauss, an experienced defense attorney who tried over sixty cases for the Public Defender's Office over twenty-five years, testified that he did in fact speak with defendant about his case on multiple occasions, and that defendant advised him of several family members with whom he resided as well as his girlfriend who could provide the basis for an alibi defense. According to Strauss, while the case was pending, he, defendant's mother and three of his sisters discussed providing an alibi for defendant in the courthouse hallway after a status conference. In addition, Strauss testified that he had weekly telephonic conversations with defendant's mother. Based on these conversations, Strauss filed a notice of alibi in anticipation of cooperation by the family members and requested his investigator, Michael Petrillo, to take statements from the witnesses to support an alibi defense. To corroborate his testimony, both the notice of intent to rely on alibi as a defense and the request for investigation were admitted into evidence at the evidentiary hearing.

Petrillo confirmed that he was requested by Strauss to interview defendant's girlfriend and eight of defendant's family members, including defendant's mother, grandfather and sister, to support an alibi defense. He obtained a statement from defendant's mother that defendant was home on the night in question and that she checked on him repeatedly during the night. Petrillo also spoke with defendant's grandfather but did not take a statement from him. None of the other witnesses provided by defendant responded or cooperated despite Petrillo's and Strauss' requests and representations by defendant's mother and family members that the witnesses would cooperate.

Strauss testified that when he started the trial, he intended to call the alibi witnesses. However, he "felt that during the trial [he] was making some headway with some of the [State's] witnesses" and he did not believe that the alibi witnesses would "help us win the case." Further, Strauss testified that because he did not have statements from the alibi witnesses, other than defendant's mother, he was unable to assess whether there was consistency among them, and was concerned that none of the purported alibi witnesses had notified the authorities of defendant's alibi when he was arrested and charged. Regarding defendant's mother, Strauss ultimately decided against using her as an alibi witness. In addition to the fact that she would be

A-3586-14T2

subject to impeachment based on her relationship to defendant, he had additional concerns about her credibility. Specifically, her statement that it was impossible for defendant to be out of the house on the night in question because he had a small child was inconsistent with defendant being arrested about a week later driving his girlfriend's car.

Strauss testified that "[h]aving a family member or a friend testify to an alibi is not . . . airtight." According to Strauss, in his experience, "if you put on an alibi that has any weakness you risk having the burden [of proof] shift from the State to the defendant" because "the jury's going to wonder . . . [w]hy are you putting on this alibi that doesn't really stand up?" Strauss believed that "you're better off attacking . . . why [the State] didn't prove their case as opposed to putting on an alibi and risk losing . . . credibility[.]" Strauss testified that he explained to defendant why he was resting without calling the alibi witnesses. When defendant protested that he had eight witnesses compared to the State's three witnesses, Strauss "tried to explain to him that the number of witnesses doesn't overcome the credibility issues." Strauss characterized his decision to not present an alibi defense as a strategic one, explaining that because there were three eyewitnesses who knew defendant from the past and placed him at the scene, "it was almost irrefutable that

he was present at the scene. And to put on an alibi in the face of that . . . , the jury would have not reacted well to that at all."

Strauss testified further that he did explain to defendant the advantages and disadvantages of testifying at the trial. Strauss acknowledged that defendant had no prior criminal record, lived approximately three miles away from the homicide scene, and would have denied being at the scene if he had testified. However, he explained to defendant that since "[t]he strategy is to concede that you were at the scene. . . . [I]f you get on the stand and testify to an alibi when the strategy is that none of these people saw what they claimed they saw then that just puts . . . our case at risk." According to Strauss, his discussion with defendant was "very civil" and defendant "agreed with" the strategy. Strauss testified that nonetheless "prior to going out on the record [he] made it clear to [defendant] it's his decision whether to testify or not. It's his right. And based upon that he . . . had to come out in court and he had to tell the court what his choice was."

Regarding the hoodie, Strauss acknowledged entering into a stipulation with the prosecutor that the hoodie admitted into evidence at trial was the hoodie defendant was wearing at the time of his arrest. Strauss explained that by agreeing to the stipulation, he avoided any testimony by the arresting officer

A-3586-14T2

concerning the circumstances of defendant's arrest, including the location and the ensuing eluding charge. Strauss testified that he told defendant what he was doing and why he was doing it and defendant said "fine." However, instead of instructing the jury that the parties agreed that the hoodie "was what [defendant] was wearing at the time of his arrest[,]" the court erroneously instructed the jury that "[t]he parties agree[d] that this [was] the hoodie in this particular case." Strauss testified that although he was aware at the time that the court had misread the stipulation, as a matter of trial strategy, he did not object and call attention to the issue because he did not want to "highlight over and over this [hoodie]." In addition, Strauss did not request a curative instruction because "what the judge told the jury, while we didn't agree with that stipulation, was not inconsistent with my argument to the jury that my client was merely present at the time of the homicide."

Following the evidentiary hearing, Judge Gardner denied defendant's petition in a written opinion. Preliminarily, Judge Gardner found the testimony of "trial counsel and his investigator . . . to be credible and the facts testified to by [defendant] and his family not to be consistent or credible." Judge Gardner noted that while Petrillo "testified consistently with . . . Strauss and corroborated trial counsel's version of how the investigation

14

unfolded[,]" defendant's family members were neither "consistent" nor "credible." In rejecting defendant's contention that Strauss did not adequately investigate, prepare, and produce alibi witnesses at trial, Judge Gardner explained:

> Mr. Strauss is an attorney of extensive experience. He clearly and consistently articulated his reasons for not pursuing the alibi defense in his testimony. Mr. Strauss' reasons for not calling the family as alibi witnesses was a strategic decision based on their lack of cooperation and his inability to have their statements taken so as to determine their testimony and how they would be perceived on the stand. Additionally, he felt that the alibi testimony they would give would not provide a uniform story to bolster the arguments that [defendant] was not at the location at the time of the incident. His decisions were clearly grounded in a choice of trial strategy by an experienced trial attorney. Mr. Strauss testified that, in his determination, the alibi that [defendant] wanted him to argue to the jury was not going to factually be a "perfect alibi" due to the lack of cooperation of corroborating witnesses. It was Mr. Strauss' trial strategy to argue that [defendant] was at or near the location, but that the identification made by the eyewitnesses was faulty. This [c]ourt does not find that the strategy chosen by trial counsel was unreasonable given the circumstances.

Next, Judge Gardner evaluated defendant's claim that he did not knowingly and voluntarily waive his right to testify at trial because trial counsel failed to properly advise him of his right and failed to properly prepare him to testify. Citing State v.

15

Savage, 120 N.J. 594, 631 (1990), certif. denied, 228 N.J. 35 (2016), Judge Gardner noted that while "'counsel's responsibility includes advising a defendant of the benefits inherent in exercising that right and the consequences inherent in waiving it'" our Supreme Court has stated that "'to ensure that counsel meets that obligation, it may be the better practice for a trial court to inquire of counsel whether he or she had advised a . . . defendant[] of his right to testify.'" Ibid. In rejecting defendant's argument, Judge Gardner accepted Strauss' testimony that he did, in fact, speak with defendant about testifying at trial. In addition, Judge Gardner pointed out that

> the [c]ourt conducted a voir dire of [defendant] about his right to testify and the positive and negative aspects of doing so . . . . [Defendant] stated under oath that he had spoken to his attorney, discussed the matter and had elected not to testify. . . . Therefore, whether or not [defendant] spoke with his attorney is of no moment. This [c]ourt conducted the voir dire of [defendant] and he acknowledged his waiver of the right to testify.

Finally, Judge Gardner evaluated defendant's contention that the "[c]ourt misread the stipulation regarding the hoodie . . . [and] mistakenly led the jury to believe he was the shooter." Judge Gardner explained:

> [Defendant] contends that while it does appear that trial counsel stipulated that . . . the hoodie, was the same hoodie that [defendant]

16

was wearing when he was arrested, it does not appear that . . . trial counsel stipulated that this was the hoodie worn by the shooter in this particular case. This allegation should have been raised by appellate counsel on the direct appeal as the issue was wholly contained within the trial record. R. 3:22-3; 3:22-4. However, no such claim was made in the appeal.

Even if this claim was not procedurally barred, this claim fails substantively as well. Trial counsel's strategic and tactical decisions will not ordinarily provide the basis for a finding of ineffective assistance of counsel, even if they are miscalculations. State v. Castagna, 187 N.J. 293, 314-15 (2006). A stipulation such as one in this case is within the realm of trial counsel's strategic decision. Mr. Strauss testified at the PCR hearing that although he was aware at the time that the court had misread the stipulation, he, as a matter of trial strategy, did not object and call attention to the issues regarding the hoodie to the jury. Further, [defendant] was in court at the time and lacks an explanation for why he did not bring up the topic with Mr. Strauss at the time it happened. . . .

Even assuming such a strategic decision to stipulate to the hoodie in question amounts to ineffective assistance of counsel, however, it is highly unlikely that without the stipulation the outcome of the case would have been different. Thus, [defendant] has failed to show that trial counsel was ineffective or that but-for the alleged ineffectiveness of counsel, the outcome of the case would have been different.

Judge Gardner concluded that

the trial strategy, decision making, and performance of Mr. Strauss was not deficient

 A-3586-14T2

pursuant to <u>Strickland v. Washington</u>[, 466 U.S. 668, 104 <u>S. Ct.</u> 2052, 80 <u>L. Ed.</u> 2d 674 (1984)]. Even if this [c]ourt were to assume that the performance of trial counsel and appellate counsel were deficient, the evidence of guilt of [defendant] that was produced at trial was overwhelming. Therefore, this [c]ourt finds that there is no reasonable probability that trial or appellate counsels' performance would have changed the ultimate result in this case.

This appeal followed. On appeal, defendant raises the following arguments for our consideration.

POINT I: THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S PETITION FOR POST CONVICTION RELIEF FOLLOWING AN EVIDENTIARY HEARING SINCE THE DEFENDANT FAILED TO RECEIVE ADEQUATE LEGAL REPRESENTATION FROM TRIAL COUNSEL IN SEVERAL DIFFERENT RESPECTS, WHILE THE FACTUAL FINDINGS MADE BY THE TRIAL COURT UNDERLYING ITS DENIAL WERE NOT SUPPORTED BY THE RECORD ESTABLISHED AT THE HEARING.

A.[3] THE TRIAL COURT ERRED IN DENYING THAT ASPECT OF THE DEFENDANT'S PETITION FOR POST CONVICTION RELIEF MAINTAINING HE DID NOT RECEIVE ADEQUATE LEGAL REPRESENTATION FROM TRIAL COUNSEL AS A RESULT OF TRIAL COUNSEL'S FAILURE TO THOROUGHLY INVESTIGATE AND PRESENT AN ALIBI DEFENSE ON THE DEFENDANT'S BEHALF.

B. THE TRIAL COURT ERRED IN DENYING THAT ASPECT OF THE DEFENDANT'S PETITION FOR POST CONVICTION RELIEF MAINTAINING HE DID NOT RECEIVE ADEQUATE LEGAL REPRESENTATION FROM TRIAL COUNSEL

---

[3] Defendant's sub-parts have been renumbered for clarity.

A-3586-14T2

AS A RESULT OF COUNSEL'S FAILURE TO
THOROUGHLY DISCUSS WITH HIS CLIENT
ALL RELEVANT RAMIFICATIONS
ASSOCIATED WITH THE DECISION
WHETHER OR NOT TO TESTIFY, AS A
RESULT OF WHICH THE DEFENDANT DID
NOT TESTIFY IN HIS OWN DEFENSE.

C. THE TRIAL COURT ERRED IN
DENYING THAT ASPECT OF THE
DEFENDANT'S PETITION FOR POST
CONVICTION RELIEF MAINTAINING HE
DID NOT RECEIVE ADEQUATE LEGAL
REPRESENTATION FROM TRIAL COUNSEL
AS A RESULT OF TRIAL COUNSEL'S
FAILURE TO OBJECT TO THE TRIAL
COURT'S ERRONEOUS RECITATION OF A
STIPULATION TO THE JURY DURING ITS
CHARGE, AND BY FAILING TO REQUEST AN
IMMEDIATE CURATIVE INSTRUCTION TO
AMELIORATE THE RESULTING
PREJUDICIAL IMPACT TO THE
DEFENDANT.

POINT II: THE TRIAL COURT ERRED IN DENYING THE
DEFENDANT'S PETITION FOR POST CONVICTION
RELIEF WITHOUT AFFORDING HIM AN EVIDENTIARY
HEARING TO FULLY ADDRESS HIS CONTENTION THAT
HE DID NOT RECEIVE ADEQUATE LEGAL
REPRESENTATION FROM TRIAL COUNSEL AS A RESULT
OF TRIAL COUNSEL'S FAILURE TO INFORM THE COURT
A JUROR HAD BEEN SLEEPING DURING THE COURSE
OF THE TRIAL.

POINT III: THE POST CONVICTION RELIEF JUDGE
ERRED IN DENYING POST CONVICTION RELIEF
COUNSEL'S REQUEST TO RETURN THE EVIDENTIARY
HEARING TO THE POST CONVICTION RELIEF JUDGE
WHO ORIGINALLY PRESIDED OVER LEGAL ARGUMENT
WHICH RESULTED IN ORDERING AN EVIDENTIARY
HEARING, AND WHO ALSO THEREFORE HEARD PARTIAL
TESTIMONY FROM TRIAL COUNSEL.

II.

Claims of ineffective assistance of counsel (IAC) are generally governed by the standards set forth in Strickland v. Washington, supra, and United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), and adopted by this Court in interpreting the New Jersey Constitution.  See State v. Allah, 170 N.J. 269, 283 (2002); State v. Fritz, 105 N.J. 42, 58 (1987). To be entitled to a new trial based on IAC, a defendant must make a two-part showing:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.
>
> [Fritz, supra, 105 N.J. at 52 (quoting Strickland, supra, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693).]

Defendant bears the burden of proving both elements of an IAC claim by a preponderance of the evidence.  State v. Gaitan, 209 N.J. 339, 350 (2012), cert. denied, ___ U.S. ___, 133 S. Ct. 1454, 185 L. Ed. 2d 361 (2013).

In determining whether defense counsel's representation was deficient, "'[j]udicial scrutiny . . . must be highly deferential,' and must avoid viewing the performance under the 'distorting effects of hindsight.'" State v. Norman, 151 N.J. 5, 37 (1997) (quoting Strickland, supra, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694). Because of the inherent difficulties in evaluating a defense counsel's tactical decisions from his or her perspective during trial, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, supra, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. at 694-95 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83, 93 (1955)).

In determining whether defense counsel's alleged deficient performance prejudiced the defense, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693, 104 S. Ct. at 2067, 80 L. Ed. 2d at 697. Rather, defendant bears the burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

A-3586-14T2

sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698; see also State v. Harris, 181 N.J. 391, 432 (2004), cert. denied, 545 U.S. 1145, 125 S. Ct. 2973, 162 L. Ed. 2d 898 (2005).

We review the PCR court's findings of fact based on "live witnesses testimony" to determine whether such findings are supported by sufficient credible evidence in the record. State v. Nash, 212 N.J. 518, 540 (2013). However, we review the PCR court's conclusions of law under a de novo standard. Id. at 540-41; see also Harris, supra, 181 N.J. at 420-21. For mixed questions of law and fact, we give deference to the supported factual findings of the PCR court, but review de novo the PCR court's application of any legal rules to such factual findings. Harris, supra, 181 N.J. at 416 (citing State v. Marshall, 148 N.J. 89, 185, cert. denied, 522 U.S. 850, 118 S. Ct. 140, 139 L. Ed. 2d 88 (1997)). "[W]here no evidentiary hearing has been held, we 'may exercise de novo review over the factual inferences drawn from the documentary record by the [PCR judge].'" State v. Reevey, 417 N.J. Super. 134, 146-47 (App. Div. 2010) (alteration in original) (quoting Harris, supra, 181 N.J. at 421), certif. denied, 206 N.J. 64 (2011). Indeed, "[a]ssessing IAC claims involves matters of fact, but the ultimate determination is one of law[.]" Harris, supra, 181 N.J. at 419.

Judged by these standards, we conclude that trial counsel's performance was not deficient and we affirm substantially based upon Judge Gardner's well-reasoned written opinion. Contrary to defendant's assertions, we are satisfied that Judge Gardner's factual findings based upon his credibility assessments are supported by sufficient credible evidence in the record to warrant our deference, and we concur with his conclusions of law. Notably, we reject defendant's contention that Judge Gardner erred in overruling defendant's objection to the transfer of the PCR proceedings from Judge Leath. Although defendant "believed trial counsel's credibility had been adversely impacted" during the preliminary voir dire, rendering Judge Leath better suited to evaluate trial counsel's credibility, a factual inconsistency between trial counsel's and the prosecuting attorney's recollection of a five-minute conversation does not rise to the level of a credibility finding. We agree with Judge Gardner that there was no prejudice to defendant because trial counsel's testimony about the substantive PCR claims occurred before Judge Gardner who had the "opportunity to hear and see the witness[]" and make his own credibility findings. State v. Gamble, 218 N.J. 412, 425 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

As a whole, we find the claims defendant offers to establish IAC lacking in sufficient merit to require more than limited

comments in a written opinion. <u>R.</u> 2:11-3(e)(2). Those comments are as follows. It is well established that "[i]n matters of trial strategy, we accord great deference to the decisions of counsel[.]" <u>State v. Biegenwald</u>, 126 <u>N.J.</u> 1, 56 (1991). Moreover,

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> [<u>Strickland</u>, <u>supra</u>, 466 <u>U.S.</u> at 690-91, 104 <u>S. Ct.</u> at 2066, 80 <u>L. Ed.</u> 2d 695.]

Defendant argues that "[t]rial counsel, in essence, intentionally ignored a defense which the defendant believed was substantiated not merely by himself, but by numerous other individuals[,]" and "despite the defendant's desire to testify at trial, counsel . . . failed to call him as a witness[.]" It is axiomatic that one of the most difficult strategic decisions that any trial attorney must confront is determining which witnesses to call to the stand. <u>State v. Arthur</u>, 184 <u>N.J.</u> 307, 320 (2005).

24

> A trial attorney must consider what testimony a witness can be expected to give, whether the witness's testimony will be subject to effective impeachment by prior inconsistent statements or other means, whether the witness is likely to contradict the testimony of other witnesses the attorney intends to present and thereby undermine their credibility, whether the trier of fact is likely to find the witness credible, and a variety of other tangible and intangible factors.
>
> [Id. at 320-21.]

Therefore, like other aspects of trial representation, a defense attorney's decision concerning which witnesses to call to the stand is "an art," and a court's review of such a decision should be "highly deferential." Strickland, supra, 466 U.S. at 689, 693, 104 S. Ct. at 2065, 2067, 80 L. Ed. 2d at 694, 697. Moreover, "[c]ounsel's fear that a weak alibi could cause more harm than good is the type of strategic decision that should not be second guessed on appeal." State v. Drisco, 355 N.J. Super. 283, 291 (App. Div. 2002), certif. denied, 178 N.J. 252 (2003). Here, trial counsel's decision to withhold an alibi defense from the jury was entitled to highly deferential review by the PCR court, a standard to which the PCR court abided in concluding that there was a reasonable basis for trial counsel's strategic decision.

Even assuming trial counsel was deficient in failing to call the proffered witnesses, we are unable to find prejudice to the defense such that there is a "reasonable probability" the outcome

25

of defendant's trial would have been different, or "the factfinder would have had a reasonable doubt respecting guilt." Strickland, supra, 466 U.S. at 695, 104 S. Ct. at 2068-69, 80 L. Ed. 2d at 698. In making a prejudice finding, the PCR court must consider "the totality of the evidence before the judge or jury" and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 695-96, 104 S. Ct. at 2069, 80 L. Ed. 2d at 698-99. Here, as Judge Gardner noted, the verdict had overwhelming support in the trial record. Cf. State v. Pierre, 223 N.J. 560 (2015) (reversing denial of defendant's petition for PCR and finding that his attorney was deficient in failing to present evidence, including the testimony of absent witnesses, that could have reinforced defendant's alibi and defendant was prejudiced because there was sparse evidence implicating him in the crimes).

Defendant argues further that Judge Gardner erred in determining that his voir dire with defendant regarding his election to testify or remain silent was dispositive of defendant's IAC claim that trial counsel failed to sufficiently discuss the decision with him. However, Judge Gardner's ruling comports with State v. Ball, 381 N.J. Super. 545, 557 (App. Div. 2005), where we held "that regardless of whether defendant was advised by

counsel," the trial judge's explanation of defendant's right to testify and the possible consequences of his choice, as occurred here, defeats an IAC claim and cures any alleged deficiency in counsel's performance in that regard.

Defendant also argues that "contrary to the trial court's conclusion, the effect of the misread stipulation guaranteed the outcome of the case to the defendant's detriment, and trial counsel's failure to take appropriate action could not possibly have been characterized as constituting sound trial strategy." We disagree.

> The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt. As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal "except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial."
>
> [Castagna, supra, 187 N.J. at 314-15 (alteration in original) (citations omitted).]

This is not such an instance.

Additionally, defendant asserts that an evidentiary hearing was warranted to further address his claim that trial counsel was ineffective for failing to take action when he informed him that a juror was sleeping during the course of the trial. The mere

raising of a claim for PCR does not entitle the defendant to an evidentiary hearing. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div.), certif. denied, 162 N.J. 199 (1999). Rather, trial courts should grant evidentiary hearings only if the defendant has presented a prima facie claim of ineffective assistance, material issues of disputed fact lie outside the record, and resolution of the issues necessitate a hearing. R. 3:22-10(b); State v. Porter, 216 N.J. 343, 355 (2013). "Rule 3:22-10 recognizes judicial discretion to conduct such hearings." State v. Preciose, 129 N.J. 451, 462 (1992). Here, we discern no abuse of discretion in Judge Leath's rejection of defendant's self-serving claim without granting an evidentiary hearing as defendant's vague assertions in essence amounted to uncorroborated "bald assertions[.]" Cummings, supra, 321 N.J. Super. at 170.

The purpose of the constitutional guarantee of effective assistance of counsel "is simply to ensure that criminal defendants receive a fair trial." Strickland, supra, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694; see also Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("The test [of ineffective assistance] has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. . . . We are not interested in grading lawyers' performances; we are interested in whether the

adversarial process at trial, in fact, worked adequately.") (quoting White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992), cert. denied, 514 U.S. 1131, 115 S. Ct. 2008, 131 L. Ed. 2d 1008 (1995)), cert. denied, 516 U.S. 856, 116 S. Ct. 160, 133 L. Ed. 2d 103 (1995).  Thus, "[t]he test is not whether defense counsel could have done better, but whether he met the constitutional threshold for effectiveness."  Nash, supra, 212 N.J. at 543.

A review of the complete record shows that trial counsel made an objectively reasonable decision regarding his overall strategy in defending the charges against defendant and that he conducted this defense in a reasonably effective manner.  Therefore, we are satisfied that trial counsel's representation of defendant fell "within the wide range of reasonable professional assistance" to which an accused is entitled and that defendant received a "fair trial." Strickland, supra, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3586-14T2